VICTORY, J.
1 ,We granted and consolidated these writ applications primarily to determine whether the court of appeal erred in reversing an order of the Council of the City of New Orleans (the “Council”) and directing Entergy New Orleans, Inc. (“ENO”) to refund $34,300,000 to its ratepayers for charges related to System Fuels, Inc.(“SFI”) Period Costs which ENO had been collecting through its Fuel Adjustment Clause (“FAC”) from 1985 through 2000. After reviewing the record and the applicable law, we reverse that portion of the court of appeal judgment because the Council’s decision as ENO’s regulator to allow ENO to pass SFI Period Costs through the FAC for that time period and not to require that ENO refund these costs to its customers was not arbitrary *66 and capricious and was reasonably based on the evidence presented.
FACTS AND PROCEDURAL HISTORY
ENO is an electric utility company engaged in the manufacture, generation, transmission, distribution, and sale at retail of electric power and energy to approximately 190,000 residential, commercial, industrial, and governmental | ¡¡customers located in that portion of New Orleans east of the Mississippi River.[1] ENO is a wholly owned subsidiary of En-tergy Corporation (“Entergy”).[2] On May 12, 1999, customers of ENO (“plaintiffs”) filed a complaint with the Council against ENO, Entergy, ESI, and Entergy Power, Inc. (“EPI”)[3] requesting that the Council institute an investigation to review ENO’s FAC filings and the costs passed through to ENO’s ratepayers, including, but not limited to, the propriety of the inclusion of certain costs in the FAC rather than in the base rate.[4]
 FACs are “widely-accepted rate making tools utilized to allow a utility to recoup fluctuating fuel costs on an ongoing basis.” Daily Advertiser v. Trans-La, a Div. of Atmos Energy Corp., 612 So.2d 7, 22 (La.1993). They are “a device to permit rates to adjust automatically, either up or down, in relation to fluctuations in | acertain, narrowly defined, operating expenses.” Id. at 11 n. I.[5] Regulators “em *67 ploy such clauses when they encounter an item of expense, such as fuel costs, that tends to be more volatile in comparison to the utility’s other costs.” Id. (Citing Southern California Edison Co. v. Public Utilities Com’n, 20 Cal.3d 813, 144 Cal.Rptr. 905, 576 P.2d 945 (1978)). The clause allows utilities to pass fluctuating fuel costs along to customers as the costs are incurred, without filing numerous base rate cases, and the customer’s rate varies directly with the utility’s fluctuating costs. Id.[6]
The charges complained of most relevant to this proceeding are SFI Period Costs. SFI is a corporate affiliate of ENO that has provided fuel-procurement and fuel-storage services to Entergy’s affiliates, including ENO, since the 1970s. The “Period Costs” are non-fuel administrative costs incurred by SFI to provide the fuel procurement and fuel storage services to Entergy, and these costs are periodically allocated to members to the Entergy system, including ENO. ENO has passed these costs to its customers through its FAC since the 1970’s. The plaintiffs claim that ENO ratepayers have been overcharged by approximately $26,000,000, plus interest, from 1985 through 2000, not because such costs were imprudently incurred, but because SFI Period Costs should have been included in ENO’s base rates and not its FAC.
The regulatory proceeding before the Council that is the subject of these writ applications was initiated on August 19, 1999, when the Council issued Resolution No. R-99-525, opening Docket No. UD-99-2, and ordering an investigation and evidentiary hearing into matters raised by the plaintiffs in their complaint filed on |4May 12, 1999. For more than three years, the issues raised were the subject of extensive discovery and intensive review and analysis by the parties. From February 26, 2002, through March 15, 2002, an evidentiary hearing was conducted by Hearing Officer Jeffery S. Gulin, who compiled the evidentiary record upon which the Council relied in rendering its decision in this proceeding. Following the hearing, the parties filed post-hearing briefs, and proposed findings of fact and conclusions of law.
On February 5, 2004, the Council issued Resolution and Order No. R-04-66. In this 79-page Resolution and Order, the Council ordered a refund of approximately $7,200,000, plus $4,100,000 in interest, relating to certain costs which the Council found had been improperly flowed through ENO’s FAC: (1) $3,957,925, plus interest, associated with excess costs from transactions related to EPI; (2) $1,831,404, plus interest, associated with “wrongful profits”; and (3) $1,414,098, plus interest, associated with capacity costs related to firm energy purchases. The Council rejected the plaintiffs’ claims relating to SFI Period Costs, the use of a margin in making power purchase decisions, and other alleged “imprudent procurement practices.” ENO complied with the Resolution and refunded $11,310,072 to its customers.
The plaintiffs appealed the Council’s Resolution to the district court seeking additional refunds. On May 26, 2005, after briefing and oral argument, Judge Robin Giarrusso affirmed the Council’s Resolution, finding that the evidence in the record supported the Council’s decision not to award any refund based on the margin or the SFI Period Costs.
The plaintiffs then appealed this ruling to the Fourth Circuit Court of Appeal. On February 25, 2008, the Fourth Circuit issued a 157-page decision affirming in part *68 and amending in part the Council’s Resolution and the trial court’s judgment. Gordon v. Council of City of New Orleans, 05-1381 (La.App. 4 Cir. 2/25/08), 977 So.2d 212. The Fourth Circuit rejected three of the four assignments of error, finding that the Council did not act arbitrarily and capriciously when it dismissed the plaintiffs claims regarding SFI Period Costs (Assignment of Error No. 1), the Arkansas Electric Cooperative Corporation Adders[7] (Assignment of Error No. 2), or fraud (Assignment of Error No. 4). Regarding the SFI Period Costs, the Fourth Circuit devoted 64 pages analyzing the Council’s role in setting rates, the parties’ positions on SFI Period Costs, relevant legal authorities, expert testimony, and the testimony before the Council. The court then made several paragraphs of relevant findings on the SFI period costs, all supporting its conclusion that “we find that this assignment of error does not have merit, and conclude that the district court was also correct in affirming the Resolution of the City Council as to its findings in the administrative proceeding.”[8] Id. at 277. However, the Fourth Circuit substantially *69 | (¡modified the Council’s decision not to award any refund based on ENO’s use of the margin.[9] With respect to plaintiffs’ claim concerning the margin, the court discussed the issue for 32 pages and then reversed the Council’s Resolution only as to the 17amount refunded, which had been $11,000,000 as to the margin. Id. at 297.[10] This modification to the refund amount was stated to be based on the court’s apparent beliefs that the Council’s refund, $11,000,000, was (1) disproportionate to a refund ordered as a result of a settlement with the Louisiana Public Service Commission (“LPSC”) in another case, Delaney v. Entergy, Inc., $72,000,000, and (2) too low considering the refund amount the Council’s own advisors had recommended, which the court stated was $34,300,000. Id. In reality, the $72,000,000 refund in Delaney had nothing to do with margins and the $34,300,000 recommended by the City Council advisors was actually for SFI Period Costs, not margins. After reviewing the opinion, both parties moved for a rehearing, with the plaintiffs requesting that the Fourth Circuit correct its “clerical error” and leave in place the refund amount, but change its justification for the refund from Assignment of Error Three to Assignment of Error One.
The court of appeal denied the defendants’ rehearing application but granted that of the plaintiffs. On April 4, 2008, in an unreported “Order,” the court of appeal changed nothing of the language of the entire opinion, including its lengthy discussion and reasoning regarding the SFI Period Costs or the margin, but changed the outcome regarding the SFI Period Costs and margin refunds by changing a few *70 words in the opinion. The Order states, in pertinent part:
[J. With respect to this Court’s 157 page decision in the above captioned matter, dated February 25, 2008:
a. This court amends its decision and concludes that Assignment of Error No. 1, does have merit as found by the City Council’s Advisors with respect to SFI Period Costs. This Court holds that the distinct court was incorrect in affirming the City Council’s rejection of the plaintiffs claims. Specifically, the Court amends its decision at page 114, top of page, first full sentence which currently reads:
Therefore, we find that this assignment of error does not have merit and conclude that the district court was also correct in affirming the Resolution of the City Council as to its findings in the administrative proceeding.
Is amended henceforth to read:
Therefore, this Court finds that this assignment of error does have mer- , it, and conclude that the district court was incorrect in affirming the Resolution of the City Council as to its findings in the administrative proceeding, and award SFI Period Costs, as they are included in the City Council Advisors’ recommendation, discussed in connection with Assignment of Error no. 3, below.
b. Specifically, the Court amends the first sentence of the first paragraph of its DECREE at page 156, which reads:
For the reasons above stated, we affirm the City Council’s Resolution and the district court’s judgment with respect to the Appellants’ first, second, and fourth assignment of error, finding that there was no arbitrariness or capriciousness in the City Council’s order and/or the district court judgment.
Is amended henceforth to read:
For the reasons above stated, we affirm the City Council’s Resolution and the district court’s judgment with respect to the Appellants’ second, third, and fourth assignments of error, finding that there was no arbitrariness or capriciousness in the City Council’s order and/or the district court judgment,
c.Finally, the Court amends the first sentence of the second paragraph of its DECREE at page 156, which reads:
As to the Appellants’ third assignment of error concerning the City Council’s resolution to order a refund to [3ratepayers for overcharges, we reverse on this issue only as to the amount ordered refunded, finding that the City Council’s resolution was arbitrary and capricious.
Is amended to read:
As to the Appellants’ first assignment of error concerning the City Council’s resolution to order a refund to ratepayers for overcharges, we reverse on this issue only as to the amount ordered refunded, finding that the City Council’s resolution was arbitrary and capricious.
II. With respect to this Court’s holding that the full amount of refunds recommended by the City Council’s advisors is ordered refunded to ENO’s ratepayers, this Court amends its decision to expressly state that legal interest shall be added to the refund amount, less any legal interest paid on prior partial refunds ordered by the City Council,
a. The Court amends the [sic] its decision at page 157, to insert the following language immediately prior to the last sentence to henceforth read:
This Court’s reference to the $34.3 million sum is not meant to exclude *71 the applicability of interest on the remainder of that sum still to be refunded (i.e., $34.3 million les [sic] the $11.3 million already refunded), which as a matter of law must be added, consistently with the initial partial refund ordered by the City Council as noted in footnote 8 of this decision.
(No cite available as unreported and achieved through an Order.)
Essentially, without altering the lengthy analysis concerning SFI Period Costs and its reasoning as to why no refund should be awarded for these costs, the Fourth Circuit changed its conclusion by changing the words “this assignment of error does not have merit” to “this assignment of error does have merit.” The court also switched the $34,300,000 refund it ordered from assignment of error three (the margin), to assignment of error one (SFI Period Costs). Whether their ultimate conclusion on rehearing was error or not, it is exceedingly difficult to analyze that conclusion when their reasoning supports what appears to be the opposite conclusion.
|inIn any event, ENO and the Council filed four writ applications in this Court. In 08-C-0929 and 08-C-0932, they allege that the court of appeal erred in ordering a $34,300,000 refund for SFI Period Costs. Almost simultaneously, ENO and the Council also filed petitions for “Suspensive Appeal and Judicial Review” with the court of appeal, seeking to appeal to this Court. On May 9, 2008, the court of appeal denied the petitions for appeal. From that order denying the appeal, ENO and the Council filed writ applications 08-OC-1226 and 08-OC-1240, arguing that because the jurisdiction of the court of appeal involves a utility regulatory matter, they should be entitled to appeal to this Court pursuant to La. Const. Art. IY, § 21. We granted and consolidated all four writ applications. Gordon v. Council of the City of New Orleans, 08-C-0929, 08-C-0932, 08-OC-1226, 08-OC-1240 (La.10/24/08), 8 So.3d 563, 564. We now determine that because we granted ENO and the Council’s writ applications on the merits in 08-C-0929 and 08-C-0932, the issue raised in the other writ applications is moot and we now withdraw the writ grants as to 08-OC-1226 and 08-OC-1240 and deny those writ applications.
DISCUSSION
As authorized by the Louisiana Constitution and pursuant to the Home Rule Charter of the City of New Orleans, all legislative powers of the City are vested in the Council. La. Const. Art. 6, §§ 4-6 (1974), Home Rule Charter 3-101(1).[11] Among the legislative powers exclusively granted to the Council are the powers of “supervision, regulation, and control” over those utility companies that furnish services within the City of New Orleans. Home Rule Charter 3-130(1);[12] see also 1 uState ex rel. Guste v. Council of City of New Orleans, 309 So.2d 290, 293 (La.1975). *72 Rate making is included in the Council’s exclusive regulatory powers over utility companies. Home Rule Charter 3-130(2).[13]
The standard of review of rate making determinations has been enumerated by this Court on numerous occasions, mainly concerning orders of the Louisiana Public Service Commission (“LPSC”). The LPSC has regulatory and rate making powers over all public utilities in this state, except those operating in New Orleans and governed by the Council. This Court has held that an order of the LPSC should not be overturned unless it is arbitrary and capricious, a clear abuse of authority, or not reasonably based upon the factual evidence presented. Entergy Louisiana, LLC v. Louisiana Public Service-Com’n, 08-0284 (La.7/1/08), 990 So.2d 716, 723 (citing Entergy Gulf States, Inc. v. Louisiana Public Service Com’n, 00-0336 (La.8/31/00), 766 So.2d 521, 525; Entergy Louisiana, Inc. v. Louisiana Public Service Com’n, 98-0475 (La.9/9/98), 717 So.2d 217, 218). The function of the reviewing court is not | lgto re-evaluate and re-weigh the evidence, or to substitute its judgment for that of the LPSC. Id. (citing Washington-St. Tammany Elec. Co-op., Inc. v. Louisiana Public Service Com’n, 95-1932 (La.4/8/96), 671 So.2d 908). The LPSC is entitled to deference in its interpretation of its own rules and regulations, though not in its interpretations of statutes and judicial decisions. Id. (citing Alma Plantation v. Louisiana Public Service Com’n, 96-1423 (La.1/14/97), 685 So.2d 107, 110). The LPSC’s interpretation and application of its own orders deserve great weight because the LPSC is in the best position to apply them. Id. (citing Dixie Elec. Membership Corp. v. Louisiana Public Service Com’n, 441 So.2d 1208, 1211 (La.1983)).
Just as the LPSC has exclusive statewide regulatory and rate making powers over public utilities, the Council has exclusive regulatory and rate making authority over public utilities in New Orleans. This Court has stated that the proper standard of review over the Council’s decisions in this regard is the arbitrary and capricious standard. Alliance For Affordable Energy v. Council of City of New Orleans, 96-0700 (La.7/2/96), 677 So.2d 424, 434. Regarding the regulatory and rate making authority of the Council, we have held that “[rjecognition of that authority requires that we limit our review to a determination of whether [the decision] is reasonable and refrain from merely substituting our judgment for that of the Council.” State ex rel. Guste, supra at 294. As both the LPSC and the Council ax-e regulators of public utilities and experts in their knowledge of that field, we apply the same standard of review to the Council as we do to the LPSC.
*73 This Court has explained the “public utility concept” underlying governmental regulatory authority over public utilities as follows:
Fundamentally, two characteristics of operation peculiar to those enterprises that supply continuous utility services through permanent physical connections between the plant of the supplier and the premises of the consumer (i.e., public utilities) require their public regulation: (1) 113the economic necessity of the services to the community, and (2) the severely localized and restricted market for utility services (so limited because of the necessarily close physical connection between the utility plant on the one hand and the consumers’ premises on the other) that, combined with the economies of a large-scale enterprise, requires monopoly status to service (i.e., competition within such a limited market would substantially increase the costs of services and/or bankrupt the rivals). See J. Bonbright, Principles of Public Utility Rates 7-17 (1961). Thus, in exchange for their favored status, furnish-ers of utility services submit to public regulation, which generally sanctions utility rates that provide a limited but reasonable return on the investment of the public utility. In effect, the public regulation acts as a substitute for competition. Id.
State ex rel. Guste, supra at 292.
 In utility rate making, the primary objective is to allow the company sufficient revenues to meet its operating expenses, provide its shareholders with a reasonable rate of return, and attract new capital. Central Louisiana Elec. Co. v. Louisiana Public Service Com’n, 508 So.2d 1361, 1364 (La.1987); South Central Bell Tel. Co. v. Louisiana Public Service Com’n, 352 So.2d 964, 967 (La.1977). The rate making process involves a complicated set of factors under which the regulator approves base rate increases or requires base rate decreases. Base rates should allow the utility the opportunity to recover prudently incurred operating and maintenance expenses, taxes, and a fair return on investment that is used and useful in providing utility services. Base rates may not change except as a result of a base rate proceedings. (See Central Louisiana Elec. Co., supra at 1364-1371 for a full explanation of the rate making process.)
 As stated earlier, FACs “are widely accepted rate making tools.” Daily Advertiser, supra at 22. “The commission’s allowance of monthly cost adjustments pursuant to such clauses does not constitute rate making in the traditional sense of that term because such adjustments go into effect without an antecedent reasonableness review and thus are not ‘commission-made’ rates.” Id. They are | Uunlike commission-made rates, or base rates, “which are implemented subsequent to an exhaustive evidentiary presentation of the utility’s expenses and their reasonableness.” Id. at n. 26 (citing Eqivitable Gas Co. v. Pennsylvania Public Utility Com’n, 106 Pa.Cmwlth. 240, 526 A.2d 823, 830, appeal denied, 516 Pa. 644, 533 A.2d 714 (1987)). “The distinction between rates implemented pursuant to automatic fuel adjustment clauses and ‘commission-made’ rates is that while the latter are the result of a full-fledged rate proceeding in which the reasonableness of all the utility’s costs are reviewed, the former are implemented automatically with no antecedent reasonableness review.” Id. “Such clauses are generally adopted in a rate proceeding as an integral part of a utility’s overall rate structure.” Id. (citing Scales v. Arizona Corp. Com’n, 118 Ariz. 531, 578 P.2d 612, 616 (1978); Public Service Co. of New Hampshire v. Federal Energy Regulatory Com’n, 600 F.2d 944, 947 (D.C.Cir.), cert. *74 denied, 444 U.S. 990, 100 S.Ct. 520, 62 L.Ed.2d 419 (1979)).[14]
FACs are not designed to allow the utility to earn a profit, but are instead designed to permit a dollar-for-dollar recovery in fuel costs. Id. at 24 (cites omitted). The customer is only harmed by the implementation of such clauses if such clauses are “manipulated or abused.” Id. Any person who believes the rates to be unreasonable may file a complaint with the regulator, in this case, the Council, Id. The regulator retains jurisdiction to review and determine whether costs passed on through such clauses are just and reasonable and thus prudently incurred by the utility. Id. The regulator’s “ongoing authority to investigate fuel cost adjustments passed on through such clauses includes the power, when necessary, to take | ^corrective measures and to order refunds for charges not prudently incurred ...” Id. at 25 (cites omitted). The regulator “has the power to review these filings to determine if overcharges were made, and, if appropriate, to order refunds or fashion other appropriate remedies.” Id. at 30. Accordingly, the Council must determine whether the costs included in the FAC are reasonable and properly included in the FAC, and if they are found not to be, the Council has the power to order refunds or fashion other appropriate remedies. Here, the determination focuses on whether the SFI Period Costs were properly passed through the FAC, as no party disputes that the charges were prudently incurred.
The Council made the following findings with respect to the SFI Period Costs in this case:
SFI Period Costs are non-fuel administrative costs incurred by SFI to provide fuel procurement and fuel storage services to Entergy which are then allocated to certain Operating Companies pursuant to an SEC-approved procedure. Those costs are presently recovered by ENO through its FAC, and have been recovered in this manner since the 1970’s.
Plaintiffs, Intervenors and Council Ad-visors claim that ENO ratepayers have been overcharged by approximately $26 million, plus compound interest, from 1985 through 2000, not because such costs were imprudently incurred, but because SFI Period Costs should have been in ENO’s base rates and not its FAC. All parties in this Docket argue that no Council resolution explicitly allows the recovery of SFI Period Costs through the FAC. Council Advisors’ witness Walsh contends that Council Ordinance No. 10663 does explicitly state which fuel expense accounts (FERC accounts 501, 518, 547 and 555) should be recovered through the FAC. Further, Witness Walsh notes that the FERC determined in an audit concluding in 1997 that SFI Period Cost expenses should not be included in FERC account 501, but rather in other specific accounts and thus not charged through the wholesale FAC.
ENO argues that SFI Period Costs have been properly recovered through the FAC because (i) rate case treatment of those costs in the 1974-75 ENO rate case resulted in their having the status of a filed rate; (ii) rate case treatment of *75 those costs since the Council regained jurisdiction over ENO from the LPSC in 1985 resulted in their having the status of filed rates; (iii) repeated independent audits of ENO’s FAC focused on the | ^method of recovery of SFI Period Costs, and those audits were furnished to the Council, but the Council elected not to change the method of recovery from FAC to base rates; (iv) no party, including the Plaintiffs and Intervenors, has challenged the prudence of those costs; and (v) the LPSC, when confronted with this issue in the Delaney proceedings, did not order a refund. ENO maintains that, in its 1997 General Order on fuel clause components, the LPSC ordered that SFI Period Costs should be moved into ELI’s base rates prospectively only, on a revenue-neutral basis, and that no disallowances were ordered of prior incurred SFI Period Costs, and ELI was allowed to receive 100% of its future SFI Period Costs in base rates. In LPSC Docket No. U-21497, the LPSC conducted a generic investigation regarding the FACs of jurisdictional electric utilities. On November 6, 1997, the LPSC issued its General Order No. U-21497 (the “General Order”), revising the format in which FAC filings are to be made, providing for the realignment of certain costs, including SFI Period Costs, from FAC recovery to base rates, and establishing certain reporting and other requirements relating to LPSC jurisdictional FACs. The guidelines established in General Order No. U-21497 for the realignment of costs from a utility’s FAC to its base rates apply prospectively only, as evidenced by the LPSC’s provision that such costs are to be realigned on a revenue-neutral basis. Costs can be realigned on a revenue-neutral basis only if recovery through base rates is commenced at the same time such costs are removed from the FAC calculation. The fact that the LPSC ordered a prospective realignment of costs did not, in and of itself, indicate that any realigned costs had been improperly recovered through the FAC in prior periods, and the General Order did not establish that any particular cost component was improperly included in FAC filings prior to the revenue-neutral realignment prescribed by the General Order.
Although testimony has been introduced in this proceeding by the Plaintiffs, In-tervenors and the Advisors to the effect that SFI Period Costs should not be included in ENO’s FAC, we find, as a matter of equity, that no retroactive refund for SFI Period Costs should be made.
The Council notes that, while independent audits of the fuel clause were conducted as well by the Department of Utilities, there is no evidence that such FAC audits were ever the subject of extensive review by the Council, and any inaction with respect thereto by the Council cannot be deemed to be concurrence with any action or inaction on the part of ENO. However, the Council finds that the ratepayers were not harmed by ENO’s inclusion of SFI Period Costs in the FAC. First, no party challenged the prudence of the SFI Period Costs, and thus the Council is required to allow ENO the opportunity to recover those costs in either the FAC or base rates. Second, ENO does not earn a return on the recovery of SFI Period Costs through its FAC where it would if such costs were recovered through base rates. Because the level of the SFI Period Costs have declined over time, and because of the “regulatory |17lag” involved in base rate proceedings, the ratepayers might have paid more than *76 they did if those costs had been included in base rates rather than in the FAC. The Council takes notice both of the action the LPSC took in this regard and of the action the Council itself took with respect to ELI’s rates in Algiers (including SFI Period Costs, for which the Council ordered no refund), in Resolution R-00-799. However, the real violation at issue here is ENO’s action to recoup these charges via the FAC without prior authorization. As part of Settlement in Docket No. UD-01-04, ENO proposed, and the Council authorized prospectively, ENO’s recovery of SFI’s period costs through the FAC. ENO’s rate case was the appropriate forum for resolution of this issue and no further action by the Council is required.
No credible facts were introduced to support a claim that the inclusion of the SFI Period Costs in ENO’s FAC filings was (i) the result of any intention to harm or deceive ENO’s ratepayers; (ii) the result of any manipulation or abuse of the FAC to the detriment of ENO’s ratepayers; or (iii) the result of any agreement between ENO and any of its affiliates to harm the ratepayers; or (iv) fraudulent.[15]
Thus, the Council determined not to order a refund for SFI Period Costs based on the following reasons: SFI Period Costs have been recovered through ENO’s FAC since the 1970s, and no party had challenged this method of recovery; LPSC General Order No. U-21497 did not disclose whether SFI Period Costs had been improperly recovered through the FAC in prior periods and only ordered them realigned into base rates on a prospective basis, with no refund ordered; when actually presented with the issue in a separate rate case the Council permitted the prospective recovery of SFI Period Costs through ENO’s FAC; although the LPSC had realigned SFI Period Costs from the FAC into base rates prospectively and on a revenue-neutral basis prior to the Delaney case, the LPSC in Delaney had ordered no refunds for prior periods; the costs were prudently incurred; ENO did not pass them on to ratepayers with an intent [ 1sto harm, deceive, or defraud them; ratepayers were not harmed; ENO did not earn a return on the recovery of SFI Period Costs through its FAC as it would have if such costs were recovered through base rates; and because SFI Period Costs have declined over time, ratepayers likely benefitted by ENO’s inclusion of them in its FAC.
After reviewing the evidence in the record, we find that there is sufficient evidence to support the Council’s finding that no refund should be ordered for SFI Period Costs in this case. First, the evidence shows that ENO has been including SFI Period Costs in its FACs since the 1970s, a fact well known by the Council. In 1974, ENO requested a base rate increase to reflect rising fuel costs. In that proceeding, the issue of the effect of including SFI Period Costs in the FAC or the base rates was addressed. As a result, on November 5, 1975, the Council adopted Resolution No. 75-178, which allowed ENO to continue its recovery of SFI Period Costs through the FAC. Bruce Loui-selle, an expert hired by ENO, testified that in Council Resolution 75-150, a specif *77 ic request was made to transfer the recovery of SFI Period Costs from the FAC to base rates and the Council did not approve that request. Louiselle also testified that in Council Resolutions R-85-526, R-85-685, and R-86-92, the Council ordered ENO to freeze its FAC at rates that included the recovery of SFI Period Costs.
George Panzeca, a former city auditor with Price Waterhouse and Ernst & Young, testified that there were seven audits of ENO between 1980 and 1997. He asserted that the Council was aware of the fact that SFI Period Costs were recovered via the fuel adjustment charge since at least 1974, and that the FAC charged was disclosed in its monthly FAC filings to the Council. Specifically, in 1981, 1986, 1988, and 1994, the auditors hired by the City questioned whether SFI Period Costs should properly continue to be included in the FAC and recommended that the 119Council consider the appropriateness of this practice. However, the Council never ordered any realignment of SFI Period Costs into base rates. In his opinion, refunds of the SFI Period Costs would conflict with the regulatory history of the handling this matter. The Council found in the instant Resolution regarding the audits that they were not subject to extensive review by the Council and that any inaction on the part of the Council cannot be deemed to constitute concurrence with ENO’s actions or inactions. Thus, it can fairly be said that the Council was aware of ENO’s practices regarding SFI Period Costs and chose not to take the advice of the auditors regarding those costs, but that does not mean that they necessarily concurred in this practice.
The Council noted the prior action it had taken regarding SFI Period Costs in R-00-799 regarding ELI’s rates in Algiers.[16] In R-00-799, ELI had voluntarily requested a base rate decrease pursuant to which SFI Period Costs would remain in the FAC. The Council approved this base rate decrease.[17]
In the LPSC’s General Order No. U-21497, the LPSC conducted a general investigation into the FACs for utilities within its jurisdiction which was initiated to investigate the computation of the FAC of EGS, an ENO affiliate. The General Order “was designed to address the issue of which costs should and should not be recovered through the [FAC] and to standardize various reporting and review requirements,” as there were no clear guidelines on that issue. The LPSC recognized the “apparent trend of utilities recovering non-fuel related costs through its FAC” and stated that this was “problematic” because these costs are then subject to less scrutiny and result in the utility “effectively granting] themselves single issue rate increases |2nwhen those costs may have been offset by other savings or expense reductions for costs reflected in base rates.”[18] The General Order included a *78 list of the types of costs that could be included in LPSC jurisdictional FAC filings [19] and the types of |g1 costs that were *79 excluded.[20] Special exceptions could be made with the approval of the Commission. The General Order contained specific reporting and filing requirements going forward and for audits every other year. The General Order did not specify whether period costs were includable or excluda-ble costs. As a result of the General Order, any costs that had been incorrectly included under FACs would be realigned prospectively, on a revenue neutral basis. The LPSC Staff noted that the action of ordering the realignment of costs did not, in an of itself, imply that any realigned costs had been improperly received through the FAC in prior periods.
Subsequently, in LPSC Docket No. U-23626, ELI requested to have certain fuel costs, including SFI Period Costs, realigned pursuant to General Order No. U-21497, from its FAC to a separate base rate rider applicable to all of ELI’s electric rate schedules effective January 1, 1998. This realignment was approved and Igaimplemented prospectively, on a revenue neutral basis, as contemplated by General Order U-21497. In neither U-21497 nor U-23626 did the LPSC order a retroactive refund of SFI Period Costs that had been included in the companies’ FACs.
The Council, and both lower courts, relied on Delaney v. Entergy Louisiana, Inc. and Entergy Corp., Docket No. 23356, a very similar case in which a settlement was reached. In that case, the plaintiffs filed a petition asking that the LPSC investigate costs flowed through ELI’s FAC, including SFI Period Costs. The LPSC stated that it had sanctioned the recovery of SFI Period Costs through ELI’s FAC in numerous base rate proceedings, as well as in ELI’s monthly FAC hearings prior to 1991. In addition, the LPSC stated that SFI Period Costs were prudently incurred, and until these costs were realigned pursuant to LPSC General Order No. U-21497, they were properly included in ELI’s FAC filings. Accordingly, the LPSC concluded that a refund of SFI Period Costs was not warranted because ratepayers were not harmed by the inclusion of these costs in the FAC, ordering a refund would deny ELI all recovery of SFI Period Costs even though there was no evidence they were imprudently incurred, and there was no evidence of fraud or intent to deceive. The LPSC decided to prospectively require ELI to pass SFI Period Costs through its base rates rather than the FAC, but did not order a refund of any SFI Period Costs passed through the FAC in prior years. The settlement in Delaney did result in a $72,000,000 refund to ratepayers, but this refund did not involve SFI Period Costs.
The Council also found that the SFI Period Costs were prudently incurred, which no party seems to dispute, that there was no intent to deceive, and that the ratepayers were not harmed. Evi *80 dence in the record supports that fuel prices were declining.
12:>,The Plaintiffs take issue with respect to the Council’s findings on several grounds. Indeed, the Council’s own advis- or, Kenneth Walsh opined that the Council should order a refund for SFI Period Costs,[21] concluding as follows:
Clearly, ENO has not adhered to Council Resolution Nos. R-76-135, and R-76-179 regarding the proper treatment of SFI period costs in that these costs are non-fuel related fixed expenses that should not be recovered through the fuel adjustment clause. In addition, a 1991 audit conducted by Ernst & Young clearly indicates the proper treatment of SFI period costs. Most telling is that ENO has continued, despite FERC’s explicit recommendation to the contrary, to report its SFI period costs in FERC Account 501 and therefore subsequently has and continues to flow through these costs in its monthly fuel adjustment filings. The ultimate impact on ENO ratepayers is the ability of ENO to recover SFI period fixed costs via its fuel adjustment in lieu of base rates. Furthermore, such costs should not be recoverable during a period when base rates are frozen as reflected in the settlement terms of its last rate case before the Council pursuant to Council Resolution No. R-98-721. Therefore, it is my belief that ENO has improperly collected approximately $25.75 million, adjusted for interest computed at applicable prime rates, of SFI period costs through its fuel adjustment filings for the period April, 1985 through December, 1999....
Regarding the evidence relied on by Walsh, we note the following. Council Resolution Nos. R-76-135 and R-76-179 did not specifically discuss SFI Period Costs. Instead, they provided a formula for the FAC based on the average fossil fuel cost and revised NOPSI’s current FAC to provide a correction factor to be included in the FAC to take into account any over or under collection of fuel costs which would result in the company recovering its exact costs.[22] We do not interpret the fact l^that these two resolutions referred only to “fossil fuel” and not to any other non-fuel costs as establishing that the Council was mandating at that time that only fuel costs could be included in the FAC.
Regarding the audit, dated September 30,1991, the accounting firm stated:
Although excluding these charges would not decrease monthly electric fuel adjustment charges by an appreciable amount, the relatively fixed and predictable nature of this non-fuel expense makes recovery through electric base *81 rates more appropriate. Such a change in the manner in which SFI period costs are recovered should be considered in the context of NOPSI’s next application for rate relief.
However, as stated earlier, the Council did not make any adjustments to ENO’s FAC based on this recommendation, as is their prerogative. Further, the audit was not a mandate, but more a suggestion that the Council consider making such a change.
Regarding the FERC recommendations, the record shows that from an audit of ENO’s records from January 1, 1990 through December 31, 1993, the FERC issued findings and recommendations in Docket No. FA-17-000. There, the FERC found that ENO was incorrectly including SFI Period Costs in Account 501 relating to fuel (and hence the FAC) and recommended that ENO adopt the necessary procedures to properly classify these expenses. ENO responded in 1997 that it was evaluating whether to continue using SFI to provide oil storage services and until such time as that was decided it would continue to use its present accounting practices. In FERC Opinion No. 366, in which the FERC ordered that an ENO affiliate realign SFI Period Costs into base rates, the FERC ordered a refund of the difference between what SFI Period Costs would have been recovered had they been in base rates. In the case sub_j^judice, the Council found that there would not have been a significant difference if the costs had been included in base rates. Further, Walsh admitted that the FERC, which regulates whole electricity rates, had no regulatory control over ENO.
The plaintiffs also rely on an internal Entergy memo to show that Entergy intended to manipulate the FAC to wrongly include SFI Period Costs. A 1987 internal Entergy report states:
LP & L and NOPSI, which are allocated about two thirds of the fuel oil and period costs, collect monies to pay these SFI period costs through their fuel adjustment clauses (just like they collect the actual costs of fuel oil). It is unclear how LP & L and NOPSI would collect these costs if fuel oil responsibility was placed outside of SFI ... Any change in the System’s method of procuring fuel oil through SFI will have significant economic implications. A change could draw attention to how the operating companies collect fuel oil and period costs. Thus, the potential exists that the collection of these period costs will be reduced by as much as the full $17-18 million. Any reduction would be reflected as System cash flow and net income decreases.
While the Council quoted this memo in its Resolution in this case, the Council evidently did not believe it supported the plaintiffs’ position. The record shows that whatever the author of this memo believed, the Council already knew ENO was passing these costs through the FAC.
Finally, plaintiffs and Walsh relied heavily on the fact that ENO had agreed to a base rate freeze during some of the years in which ENO was passing SFI Period Costs through its FAC. The record reveals that ENO was under a base rate freeze from March 20, 1986-January 1, 1998, September 5, 1991-November 1, 1996, and November 5, 1998-October 1, 2001. Another regulator, the LPSC, has found that passing unauthorized costs through the FAC during a base rate freeze is grounds for ordering a refund. Entergy Gulf States, Inc., infra at 890-91. However, in this case the Council did not find that the SFI Period Costs should have been included in the |2fibase rates. That alleviated the need for the Council to consider whether ENO was circumventing the base rate freeze.
*82 The plaintiffs argue that the Council did find that the SFI Period costs should have been included in the base rates, relying on the Council’s statement that “the real violation at issue here is ENO’s action to recoup these charges via the FAC without prior Council authorization.” They argue that this constitutes a finding that the Council found that ENO had violated its rules and regulations by passing the SFI Period Costs through the FAC. Therefore, they argue, the Council is required to order ENO to refund these SFI Period Costs. We disagree.
First of all, a finding that ENO committed a “violation” by failing to get prior Council authorization is not a finding that the SFI Period Costs were improperly passed through the FAC. Significantly, not only did the Council refuse to order a refund, its also did not order ENO to realign these costs prospectively into the base rates. In fact, all parties state that to this day, ENO is passing SFI Period Costs through the FAC. While other regulators have found that SFI Period Costs should be included in the base rates, the Council in this case has not reached the same conclusion. The Council has sole regulatory authority over ENO and is authorized by the Home Rule Charter to make this determination, even if some of the costs included in the SFI Period Costs are not technically fuel costs. No party disputes that ENO is entitled to recover SFI Period Costs; evidently the Council has determined that the ratepayers and ENO are better served if ENO collects them through the FAC. The Council as regulator of utility rates “is an expert within its own specialized field and its interpretation and application of its own [rules and regulations] ... deserve great weight, because the [Council] is in the best position to apply its own [rules and | ¡^regulations].” Dixie Elec. Membership Corp., supra at 1210 (citing Central Louisiana Elec. Co., supra).
Further, even if the Council had found that ENO violated its rules and regulations by passing the SFI Period Costs through the FAC, they would not be obligated to order a refund. In Daily Advertiser, this Court recognized the dangers involved when utility companies attempt to manipulate FACs by passing unallowable costs through them and held that the regulator “has the power to review [FAC] filings to determine if overcharges were made, and, if appropriate, to order refunds or fashion other appropriate remedies.” Although the LPSC ordered a refund in that case which this Court affirmed, contrary to the plaintiffs’ argument, that case does not mandate that a refund be ordered any time a violation is found.
In addition, while refunds have been ordered in other cases involving charges passed through a utility’s FAC, that does not mean a refund is required here. In Gulf States Utilities Co. v. Louisiana Public Service Com’n, 96-2046 (La.2/25/97), 689 So.2d 1337, the LPSC ordered a “retroactive disallowance,” i.e., a refund, of $5,200,000 that Gulf States, an ENO affiliate, wrongly double-charged its customers through its FAC, and this Court approved that refund, finding that it did not constitute “retroactive rate-making.” This case is distinguishable because the regulator, in its discretion, ordered a refund, and the costs refunded were found to be imprudent because they amounted to a double-charge. In Entergy Gulf States, Inc. v. Louisiana Public Service Com’n, 98-0881 (La.1/20/99), 726 So.2d 870, the LPSC ordered a refund for gas storage charges at an ENO affiliated company that were passed through the FAC, finding that these “carrying charges” were predictable, known or measurable costs which should have been included in the base rates. The *83 LPSC also ordered a refund for the cost of electricity supplied to two affiliated companies that | 28were passed through the FAC, finding they were operational costs that should have been included in base rates. The LPSC found this particularly objectionable because it occurred during a base rate freeze, which effectively allowed the company to circumvent the base rate freeze. 726 So.2d at 890-91. This Court affirmed the LPSC’s order, stressing that the LPSC’s decisions are entitled to great weight and will not be disturbed unless shown to be arbitrary and capricious. Id. at 891. Finding a reasonable basis in the record to support the LPSC’s conclusions and no error of law, this Court affirmed. Id. Again, that case is distinguishable because in this case, the regulator in its discretion did not order a refund, obviously because of the long history of ENO’s practice, the Council’s prior treatment of this practice, and the LPSC’s refusal to order a refund in several prior cases. Finally, with regard to the base rate freeze, it may have been that ENO’s agreement to a base rate freeze in three instances would not have occurred had they believed that the Council would not allow them to include SFI Period Costs in the FAC.
Lastly, we reject the plaintiffs’ argument that the Council’s decision was arbitrary and capricious because the Council did not follow the recommendation of its own advisors, who had recommended that the Council order a refund for SFI Period Costs. In Eagle Water, Inc. v. Louisiana Public Service Com’n, we held that “[a] regulatory body such as the [LPSC] is entitled to use its own judgment in evaluating evidence concerning a matter within its area of expertise, and is not bound even by uncontradicted opinion testimony of experts,” even its own “staffs expert opinion.” 06-1899 (La.1/17/07), 947 So.2d 28, 34 (cites omitted). In that case, we did point out that “if the [LPSC] chooses to act in this manner, the record evidence must nonetheless exist to support its decision.” Id. As discussed throughout this opinion, the evidence supported the Council’s decision.
| ^CONCLUSION
The Council has regulatory and rate making authority over public utilities operating within its jurisdiction, including ENO. The decision of whether or not to allow a utility to include certain costs within its FAC is an exercise of the Council’s regulatory and rate making authority. In this case, the Council allowed SFI Period Costs, which include costs that are not technically fuel costs, to be passed through ENO’s FAC based on the history of the Council’s treatment of ENO’s longstanding practice regarding SFI Period Costs, the LPSC’s refusal to order refunds to customers in other similar cases where public utilities within its jurisdiction passed SFI Period Costs through their FACs, and the Council’s findings that ENO’s customers were not harmed by this practice and ENO was not attempting to harm or deceive its ratepayers. While the Council’s discretion over this issue is not unlimited, the Council’s decision will not be overturned unless it is found to be arbitrary and capricious, a clear abuse of authority, or not reasonably based on the factual evidence presented. Because we find that the Council’s refusal to order a refund for SFI Period Costs passed through ENO’s FAC from 1985-2000 was neither arbitrary and capricious nor an abuse of authority, and was reasonably based on the evidence presented, the court of appeal erred in overturning the Council’s Resolution and Order regarding SFI Period Costs.
DECREE
For the reasons stated herein, the judgment of the court of appeal is reversed in *84 part and the judgment of the trial court is reinstated.
REVERSED IN PART; TRIAL COURT JUDGMENT REINSTATED.
JOHNSON, J., dissents and assigns reasons.

. ENO was formerly known as New Orleans Public Service, Inc. or "NOPSI.”

. Entergy owns five electric public utility operating companies that provide retail electric service: Entergy Louisiana, Inc. ("ELI”) (formerly known as Louisiana Power & Light Company, or "LP & L”); Entergy Arkansas, Inc. ("EAI”) (formerly known as Arkansas Power & Light Company, or "AP & L”); En-tergy Gulf States, Inc. ("EGS”) (formerly known as Gulf States Utilities Company, or "GSU”), which operates in both Texas and Louisiana; Entergy Mississippi, Inc. ("EMI”) (formerly known as Mississippi Power & Light, or "MP & L”); and ENO.
Each of these companies, along with Enter-gy's service company subsidiary, Entergy Services, Inc. ("ESI”), are signatories to the Entergy System Agreement (the "System Agreement”), a 1985 Federal Energy Regulatory Commission ("FERC”) approved rate schedule. The System Agreement governs the planning, operations, and sharing of the costs of the Entergy System and the Entergy companies and has "provided the contractual basis for planning and operating the companies’ generating units on a single-system basis, and also have provided the basis for equalizing certain cost imbalances that result from this method of planning and operating the units.” Middle South Energy, Inc., Docket No. ER 82-616-000, 31 FERC ¶ 61,305, 61,636 (1985), rehearing denied, 32 FERC ¶ 61,425 (1985), aff’d, Mississippi Industries v. F.E.R.C., 808 F.2d 1525 (D.C.Cir.), vacated in part on reconsid., 822 F.2d 1103 (D.C.Cir.) (en banc), on remand sub nom., System Energy Resources, Inc. MSU System Resources, Inc., 41 FERC 1161, 238 (1987), reh’g denied, 42 FERC ¶ 61,091 (1988), aff’d sub nom., City of New Orleans v. FERC, 875 F.2d 903 (D.C.Cir. 1989), cert. denied, 494 U.S. 1078, 110 S.Ct. 1805, 108 L.Ed.2d 936 (1990).

. EPI is a wholly owned subsidiary of Entergy which generates and sells electric energy into the wholesale market.

. The plaintiffs simultaneously filed a lawsuit with the Civil District Court alleging that the same inclusions in the FAC were the result of an antitrust conspiracy among ENO, Entergy and ESI. The plaintiffs seek treble damages calculated as three times the amount of the refunds ordered in the Council's regulatory proceeding, i.e., the case before us now. The antitrust lawsuit, since removed to federal district court, has been stayed pending a final decision in this case.

. We have described an FAC as "a fixed rule under which future rates to be charged the public are determined" and "simply an addition of a mathematical formula to the filed schedules of the [c]ompany under which the rates and charges fluctuate as the wholesale cost of gas to the [c]ompany fluctuates.” Id. (Citing City of Norfolk v. Virginia Electric & Power Co., 197 Va. 505, 90 S.E.2d 140, 148 (1955)).

. For a discussion of base rates, see pages 73-74, infra.

. Arkansas Electric Cooperative Corporation ("AECC”) is an entity from which ENO occasionally purchases power through its affiliate EAI. The "AECC energy adder” represents the operation-and-maintenance costs associated with the electric power generation purchased from AECC.

. In the paragraphs directly preceding the court of appeal’s conclusion as to SFI Period Costs, the court stated:
The record reveals that the Appellants and the Advisors of the City Council alleged that ratepayers were overcharged by approximately $26 million dollars, plus compound interest from 1985 through 2000. This was not because the SFI Period Costs were imprudently incurred, but rather because SFI Period Costs should not [sic] have been included in ENO’s base rates and not its FAC. However, the record also indicates that the parties in this matter did not assert that the City Council resolution explicitly allows for the recovery of SFI Period Costs through the FAC.
The record also indicates that Mr. Walsh testified that the City Council explicitly stated which fuel expense accounts should be recovered through the FAC. He also testified that the FERC determined, after an audit which concluded in 1997, that SFI Period Cost expenses should not be included within account 501, but rather in other specific accounts and thus not charged through the wholesale FAC.
The record also indicates that in LPSC Docket No. 21497, the LPSC conducted an investigation concerning the FACs of jurisdictional electric utilities. In this order, the LPSC issued its General Order U-21497 in which it revised the format in which the FAC filings are to be made, providing for the realignment of certain costs, including SFI Period Costs, from FAC recovery to base rates, and establishing certain reporting and other requirements relating to LPSC jurisdictional FACs. As noted earlier in this opinion, General Order No. U-21497, which provides for the realignment of base rates, applies prospectively only, as evidenced by the LPSC's provision that such costs are realigned on a revenue-neutral basis only if recovery through base rates is commenced at the time such recovery are removed from the FAC calculation.
Keeping these issues in mind, the record indicates that even though the LPSC ordered a prospective realignment of costs, this action does not indicate that any of those realigned costs had been improperly recovered through the FAC in prior periods, and furthermore, LPSC General Order No. U-21497 did not establish that any particular costs component was improperly included in FAC filings prior to the revenue-neutral realignment prescribed by the LPSC.
The record also indicates that while independent audits of the FAC mechanism were conducted, there was no evidence that such FAC audits were ever made the subject of extensive review by the City Council, and that any inaction with respect to the City Council cannot be deemed to have been in concert with ENO.
Additionally, the record indicates that the ratepayers were not harmed by ENO's inclusion of SFI Period Costs for several reasons, to wit: (1) first, no party challenged the prudence of the SFI Period Costs, and therefore, the City Council is required to allow ENO to recover such costs in either *69 the FAC, or base rates; (2) ENO does not earn a return on the recovery of SFI Period Costs through its FAC, but ENO would if the costs were recovered through its base rates.
The record also reveals that no evidence was introduced by the Appellants to support their claim that the inclusion of the SFI Period Costs in ENO's FAC filings were: (1) the result of any intention to harm or deceive ENO’s ratepayers; (2) the result of any manipulation or abuse of the FAC to the detriment of ENO's ratepayers; or (3) the result of any agreement between ENO and its affiliates to harm the ratepayers; or (4) fraudulent. These findings are consistent with the System Agreement as discussed in the LPSC’s findings in Delaney.
Since it appears that tire matters asserted by the Appellants are essentially identical to those claims raised by the plaintiffs in the Delaney case, the record does not support the Appellants’ claims of arbitrariness, capriciousness, or an abuse of discretion in the City Council’s determination that it did not abuse its role as an administrative adjudicator in refusing to order refunds to the Appellants for alleged overcharges billed by ENO to ratepayers through its FAC charges. Therefore, we find that this assignment of error does not have merit, and conclude that the district court was also correct in affirming the Resolution of the City Council as to its findings in the administrative proceeding.
977 So.2d at 275-277.

. The "margin” is the mathematical formula that dictates whether ENO purchases power from its Entergy System affiliates or from third parties in the wholesale power market.

. Specifically, with respect to the margin, the court of appeal concluded:
Therefore, we find that this assignment of error does have merit and conclude that the City Council acted arbitrarily and capriciously in ordering refunds which are grossly disparate to the refunds ordered in Delaney for identical claims. In all fairness to the parties, we conclude that the City Council’s order of refunds falls short in providing an adequate remedy to the ratepayers for the violation found by the City Council. We conclude that the appropriate refund for the ratepayers is the $34.3 million dollar amount originally suggested by Advisors of the City Council. This refund should result in an average amount of $ 191 per person for the 180,000 ratepayers.
Id. at 297.

. Section 3-101 Legislative Powers.
(1) All legislative powers of the City shall be vested in the Council and exercised by it in the manner and subject to the limitations hereinafter set forth.

. Section 3-130. Establishment of Rates.
(1) The Council of the City of New Orleans shall have all powers of supervision, regulation, and control consistent with the maximum permissible exercise of the City’s home rule authority and the Constitution of the State of Louisiana and shall be subject to all constitutional restrictions over any street railroad, electric, gas, heat, power, waterworks, and other public utility provid-inS service within the City of New Orleans including but not limited to the New Orleans Public Service, Inc. and the Louisiana Power and Light Company, their successors or asslgns.

. Section 3-130. Establishment of Rates.
(2) In the exercise of its powers of supervision, regulation and control of any street railroad, electric, gas, heat, power, waterworks, or other public utility, the Council shall, in cases involving the establishment, change or alteration of rates, charges, tolls, prices, fares or compensation for service or commodities supplied by such utilities, cause notice of the matter to be served upon the person, firm or corporation affected thereby, so that such person, firm or corporation shall have an opportunity, at a time and place to be specified in said notice, to be heard in respect to said matter. The Council shall make all necessary and reasonable rules and regulations to govern applications for the fixing or changing of rates and charges of public utilities and all petitions and complaints relating to any matter pertaining to the regulation of public utilities, and shall prescribe reasonable rules and regulations to govern the trial, hearing and rehearing of all matters referred to herein,....

. In Daily Advertiser, one of the issues involved whether a regulator's subsequent review and modification of FACs after they had been charged and recouped by the utility constituted "retroactive ratemaking,” which is prohibited. This Court found that the rule against retroactive ratemaking did not apply to the regulator's retrospective review and subsequent modification, adjustment, or refunds of such rates. 612 So.2d at 23-24. See also Entergy Louisiana, LLC, supra, 990 So.2d 716.

. Later in the Resolution and Order, when ruling on whether to impose interest on other amounts refunded, the Council remarked: "[wjith respect to the SFI issue we discussed earlier, where our conclusion was that fairness and equity required us to not impose what would have otherwise been a substantial disallowance, we exercised our discretion in favor of the Company. In this instance, again employing fairness and equity, we exercise our discretion in favor of ratepayers.”

. The Council, rather than the LPSC, has jurisdiction over ELI to the extent of its operations in Algiers.

. The Council also relied on Docket No. UD-01-04, wherein ENO proposed and the Council authorized prospectively ENO’s recovery of SFI Period Costs through the FAC. However, while the Council may have been aware of this situation, there have been no record citations for UD-01-04 and we could not locate it in the very voluminous record.

.The LPSC also explained the history of the FAC as follows:
On April 23, 1975, the Commission adopted a General Order regarding "Cost of fuel and purchased power adjustment clauses.” ("April 23, 1975 General Order”). In that Order, the Commission recognized that in various prior orders it had permitted electric utilities to "pass along the increased costs of fuel or increased costs of purchased power, as the case may be, by making submissions of cost data to *78 the Commission and requesting that the increment over base cost be approved for pass-along to the consumer on the next billing.” Id. These prior Commission actions were approved on a company-by-company basis without general industry-wide guidelines. The Commission noted that “the past several years have seen predominantly rising fuel costs and an apparent shortage of fuel in virtually every sector of the economy.” Id. In its earlier orders, the Commission had noted that the price of natural gas was “ever increasing” and that there was a "continuing upward trend thereof.” Commission Order No. 7762. These flow-throughs of fuel costs permitted the utilities to recover their actual costs of fuel in a timely manner. This mechanism avoided the requirement by electric utilities to file base rate cases to recover their fuel costs. The Commission also noted that the mechanisms in place would "also operate to reduce electric billings in times of decreasing fuel costs.” Id.
The Commission acknowledged the importance of permitting flow-throughs of this major costs component of electric generation and recognized that clauses of this type were in use nationwide. However, the Commission noted the difficulty customers were having in understanding the significant increases in their monthly electric bills. In order to increase consumer confidence, the Commission provided for monthly hearings and public participation regarding a company’s fuel clause filing. In 1991, the Commission discontinued the monthly public fuel adjustment hearings. Thereafter, electric utilities were required to continue to file their monthly fuel adjustments under oath and in writing only. The Commission, however, continued to allow requests for hearings by any interested party or consumers.
[[Image here]]
Over the years, disputes periodically developed between the Commission Staff and the electric utilities as to which costs may properly be included in a company's fuel adjustment clause.... These disputes developed, at least in part, because the Commission’s April 23, 1975 General order did not contain detailed standards regarding what is includable in and what is excluda-ble from the fuel clause. The Commission’s recent fuel clause investigations of EGSI demonstrated the magnitude of the differences in the opinions of the Commission and tire utilities regarding which costs may be properly recovered through the fuel clause. This proceeding was instituted to delineate includable and excludable costs and to establish uniform standards for all electric generating utilities in the State. These standards will also facilitate the Staff’s review of the utilities' fuel clause filings.

. Includable costs were: (1) the direct cost of fuel from a nonaffiliated party; (2) direct cost of fuel purchased from affiliated party at the lower of cost or market with the cost of the affiliated party determined in the same manner as if the electric generation utility incurred the costs directly unless such direct costs of fuel are allocated pursuant to a FERC-approved tariff, in which case the utility shall include the direct costs of fuel established by the FERC; (3) cost of fuel treatment; (4) cost of transportation of non-affiliated party; (5) cost of transportation by affiliated parly at the lower of cost or market and if the transportation cost is a direct function of the volume of fuel transported, with the cost of affiliated party determined in the same manner as if the electric generation utility incurred the costs directly; (6) costs of emission reagents such as limestone:
(7) cost of nuclear fuel amortization expense dependent upon burn; (8) cost of nuclear fuel disposal dependent upon burn imposed by the government; (9) cost of interest expense on leased nuclear fuel; (10) cost of emergency and economy purchased power including short term reservation charges but excluding investment related costs and including transmission costs to nonaffiliated parties; (11) energy cost of other purchased power upon specific Commission review and approval preferably within a base rate proceeding, excluding demand, capacity, facilities charges, and reimbursements for fixed costs recovered by the utility through base revenues, whether explicitly identified or subsumed within an energy charge; (12) revenues from emergency and economy sales to affiliated and nonaffiliated parties; and (13) energy revenues from firm sales, excluding demand, capacity, and facilities charges whether explicitly identified or subsumed *79 within an energy charge, regardless of whether sales are to affiliated or nonaffiliat-ed parties.

. Excludable costs were: (1) nonfuel operation and maintenance costs; (2) procurement costs; (3) fuel handling testing costs; (4) cost (net of sales revenues) of byproduct disposal; (5) property taxes including ad valorem taxes; (6) depreciation and amortization costs (other than nuclear fuel); (7) lease expense (other than nuclear fuel); (8) interest expense or carrying charges on capital investments and inventories; (9) purchased power demand, capacity, or facilities charges whether explicitly identified or subsumed within an energy charge, regardless of whether affiliated or nonaffiliated parties; (10) cost of and revenues from transmission for affiliated parties; and (11) firm sales revenue for demands, capacity, or facilities whether explicitly identified or subsumed within and energy charge, regardless of whether made to affiliated or nonaffiliated parties.

. Expert testimony from the other experts conflicted over whether a refund should be ordered.

. Resolution R-76-135 revised the FAC to read:
Fuel Adjustment
Plus or minus the product of the kilowatt-hours used by the Customer during the month multiplied by the amount that the average fossil fuel cost per kilowatt-hour as delivered to Company's customers in the City of New Orleans during the second preceding month is more or less than .200 cent.
Resolution R-76-179 revised the FAC to read:
Fuel Adjustment
Plus or minus the product of the kilowatt-hours used by the Customer during the month multiplied by the amount that the average fossil fuel cost per kilowatt-hour as delivered to Company’s customers in the City of New Orleans during the second preceding month, adjusted for any over or under collection of actual fuel costs that occurred during the second preceding month, is more or less than .200 cent.